J-A22040-17
J-A22041-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: T.R.R. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: H.W.R., MOTHER | : | |
| | : | No. 918 EDA 2017 |

Appeal from the Decree February 15, 2017
in the Court of Common Pleas of Bucks County,
Orphans' Court Division, at No. 2014-A9008.

| | | |
|---|---|---|
| IN RE: T.R.R. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: L.R., JR., FATHER | : | |
| | : | No. 948 EDA 2017 |

Appeal from the Decree February 15, 2017
in the Court of Common Pleas of Bucks County,
Orphans' Court Division, at No. 2014-A9008.

BEFORE: BOWES, LAZARUS, AND PLATT*, JJ.

MEMORANDUM BY PLATT, J.:                    **FILED OCTOBER 18, 2017**

In these companion cases, H.W.R. (Mother) and L.R., Jr. (Father),

appeal from the decrees of the Orphans' Court, granting petitions for the

involuntary termination of their respective parental rights (and duties) to their

son, T.R.R. (Child) (born in May of 2008) and awarding custody to the Bucks

_____

* Retired Senior Judge assigned to Superior Court.

County Children and Youth Social Services Agency (CYS).[1]  We affirm on the basis of the trial court's opinion.[2]

In its opinion, the trial court fully and correctly sets forth the relevant facts and procedural history of this case.  Therefore, we have no reason to restate them at length here.

We note briefly for context and the convenience of the reader that this case has a complicated and convoluted history.  Child has been in the care of CYS since December of 2010.  The trial court adjudicated Child dependent and placed him in the legal and physical custody of CYS at a shelter care hearing held in this matter on January 14, 2011.  (**See** Trial Court Opinion, 2/15/17, at 1; **see also** N.T. Hearing, 5/16/16, at 16).  The trial court confirms that on September 11, 2012, the permanency goal was formally changed, by agreement of the parents (who were represented by separate counsel at the hearing), from reunification to adoption.  (**See** Trial Ct. Op., 2/15/17, at 2).

Child had entered CYS' care after he was removed from Father while Mother was away on a visit to California.  It bears noting that Mother left Child (and two older siblings from a prior relationship) with Father even though he had previously attempted suicide.

---

[1] Child's long-time foster parents plan to adopt him.

[2]  We address the appeals together in one unified decision (as did the trial court).  We will refer to the cases in the singular, for simplicity.

Father had also been convicted of arson.  On an inspection visit, Father's probation officer observed that Father's home presented safety issues for Child because Father had left his psychiatric medication scattered all over the floor of the residence.  At a hearing, a CYS caseworker testified that the probation officer observed, "Father did not seem concerned that a two-year old would pick them up." (N.T. Hearing, 3/10/16, at 39).  CYS observed that Child had rotted teeth, and displayed significant speech and physical delays; he also needed leg braces, and other early intervention services.  (*See id.*).

After CYS assumed custody, and placed Child in foster care, both parents, separately, consented to the termination of their parental rights, but subsequently revoked their consents.  The trial court vacated the orders of termination.  CYS appealed from the orders vacating the terminations.  This Court eventually quashed the appeal.  The case returned to the Orphans' Court.  During the time of this appeal, Child continued to live with his foster parents.

After remand, the court held eleven days of hearings.  The testimony revealed many points of dispute.[3]  It bears noting that both parents have

---

[3] The relationship between Mother and Father, the biological parents, Appellants here, and CYS appears to have been somewhat contentious.  For example, the question of both parents' hygiene came up for discussion.  Father's hygiene appears to have been more of an issue than Mother's, as references to it recur repeatedly.  Father denies there is an issue and claims to shower every day.  However, CYS personnel maintained that Father actually reported taking a shower only every other day, and demanding that if CYS wanted him to shower more, it should pay his water bill.  CYS appears to have

mental health issues in varying degrees. One point of dispute was whether the parents were sufficiently forthcoming in acknowledging their mental health issues, and related health issues (such as Father's family history of epilepsy) or if they resisted CYS efforts at formal evaluation and treatment.

Both Mother and Father completed parenting classes, but CYS maintained they failed to apply the skills they were taught. Child resisted supervised visits and often acted out. The foster parents blamed Mother and Father. Mother and Father blamed the foster parents. CYS faulted Mother and Father for failing to follow up on suggested parenting behaviors during supervised visits.[4]

On February 15, 2017, after the conclusion of the hearings, the trial court granted the petition for involuntary termination of parental rights, accompanied by a lengthy joint opinion. In the opinion the court noted that:

> [I]t is irrefutable that Parents attempted to improve their parenting skills and achieve some of [CYS'] objectives. However, it was repeatedly apparent, throughout their testimony as well as that of [CYS] witnesses, that Parents frequently did not comprehend, could not recall, failed to implement, or resisted compliance with [CYS's] plan.

(Trial Ct. Op., 2/15/17, at 29).

---

encouraged Child to refer to his foster parents as his "forever parents" and Appellants as his "visiting parents."

[4] Eventually, CYS stopped the supervised visits altogether.

Mother and Father filed timely notices of appeal and concise statements of errors complained of on appeal on March 16, 2017. The trial court filed a joint opinion which referenced its original opinion of February 15, 2017. (*See* Rule 1925(a) Opinion, 4/03/17); *see also* Pa.R.A.P. 1925.

Mother raises the following claims on appeal:

1.   The [t]rial [c]ourt erroneously granted [CYS'] petition to terminate the parental rights of [Mother] as [CYS] failed to prove repeated and continued incapacity, abuse or neglect on the part of Mother as required [by] §2511(a)(2).

2. The [t]rial [c]ourt erroneously granted [CYS'] petition to terminate the parental rights of Mother as it failed to prove that the services or assistance reasonably available to her did not remedy the conditions which lead [sic] to the placement of [Child].

3. The [t]rial [c]ourt erroneously granted [CYS'] petition to terminate the parental rights of [Mother] under §2511(a)(8) as there is no competent evidence that the conditions which led to the removal or placement of [Child] continue to exist as to Mother.

(Mother's Brief, at 3).

Father raises the following questions on appeal:

1. Did the evidence presented at the hearing establish by clear and convincing evidence the existence of grounds sufficient to support the termination of Father's parental rights pursuant to section 2511(a)(2), (5) or (8)?

2. Did the trial court err in effectively requiring Father to carry the burden of proof with regard to his capacity to parent?

3. Did the trial court err in failing to consider and/or give weight to [CYS'] lack of reasonable efforts in its decision to terminate parental rights[?]

(Father's Brief, at 3).

- 5 -

Our standard of review for a challenge to the termination of parental

rights is well-settled:

> In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence presented as well as the trial court's factual findings and legal conclusions. However, our standard of review is narrow: we will reverse the trial court's order only if we conclude that the trial court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The trial judge's decision is entitled to the same deference as a jury verdict.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

This Court has explained:

> Where the hearing court's findings are supported by competent evidence of record, we must affirm the hearing court even though the record could support an opposite result.
>
> We are bound by the findings of the trial court which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible evidence. The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. Though we are not bound by the trial court's inferences and deductions, we may reject its conclusions only if they involve errors of law or are clearly unreasonable in light of the trial court's sustainable findings.

*In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citations omitted).

This Court has long recognized that the "best interests of the child is the

paramount consideration is . . . beyond peradventure. . . . Indeed, even the

rights of natural parents are subordinate to the child's best interest."

*Cardamone v. Elshoff*, 659 A.2d 575, 580 (Pa. Super. 1995) (citations

omitted).

- 6 -

As the party seeking involuntary termination of Mother's and Father's parental rights, CYS bore the burden of establishing by clear and convincing evidence that the stated grounds for doing so existed. The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties. The Orphans' court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants the involuntary termination.

*In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

Here, the trial court terminated Mother's and Father's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (5), (8), and (b). In order to affirm the termination of parental rights, this Court need only agree with any one subsection of Section 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004).

Section 2511 provides, in pertinent part:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.─**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

It is well-settled that a party seeking termination of a parent's rights bears the burden of proving the grounds to so do by "clear and convincing evidence," a standard which requires evidence that is "so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re T.F.*, 847 A.2d 738, 742 (Pa. Super. 2004) (citation omitted). Further,

A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*In the Interest of K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008) (citations omitted).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the trial court we conclude

that the issues Appellants have raised on appeal do not merit relief. The trial court explained the reason for its decision in this way:

> Based upon the evidence, it is clear that the conditions which have caused Mother's and Father's incapacity have not been remedied over a reasonable period of time; nor will they be remedied in the reasonably near future. [Child] has been in the care of [CYS] for more than six [ ] years. During this time, various social workers and other personnel have attempted to work with Mother and Father to effectuate a change in their attitudes and behaviors. Essentially, the result has been the same; due to the parents' incapacity, they are not reasonably capable of recognizing [Child's] needs or their inability to meet those needs. The quantum of improvement as parents has not been sufficient.

(Trial Ct. Op., 2/15/17, at 32).

On independent review we find that the trial court's findings are supported by the record. Accordingly, under our standard of review, we affirm. However, we affirm with a measure of reluctance, because the evidence of record also confirms, as the trial court suggests, that the parents did make at least some effort to comply with CYS directives. (*See id.* at 29).

We also recognize that parents' counsel have identified instances where the conduct of certain CYS personnel either amounted to an abandonment of their efforts to assist the parents, as acknowledged by the trial court, (*see id.* at 1), or provided such inconsistent direction that the parents were improperly inhibited from doing everything they were expected to do.

Father also argues that the trial court erred by failing to take into account CYS' lack of reasonable efforts to accommodate his mental handicap. (*See* Father's Brief, at 53-55). However, these related arguments do not

merit relief. The trial court candidly acknowledges CYS' deficiencies. (**See** Trial Ct. Op., 2/15/17, at 1). Nevertheless, it concludes that parents lack the capacity to parent Child required for the award of custody.[5]

Moreover, it is not our purpose to sit in judgment of the conduct of CYS personnel. Our paramount concern remains the best interest of the Child. Child has been "stuck in limbo," (Trial Ct. Op., 2/15/17, at 1), for over six years. "Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs." **K.Z.S.**, **supra** at 759. (citations omitted).

Whether the parents made sufficient effort to demonstrate their capacity to parent Child is a question of the weight of the evidence and the credibility of witnesses, both of which are the province of the trial court. Where the Orphans court's findings are supported by competent evidence of record, we must affirm its decision even though the record could support an opposite result. **See In re M.G.**, **supra** at 73-74.

---

[5] Furthermore, a change in goal from reunification to adoption, as occurred in this case, "**ends any dispute that may exist between CYS and the parent as to the adequacy of CYS' services aimed at reuniting the parent with his/her children and, of course, as to whether CYS had selected the most appropriate goal for this family.**" **In re A.L.D.**, **supra** at 339 (citation omitted) (emphasis added in original).

Under our standard of review, the trial court properly disposes of the questions presented. (***See*** Trial Ct. Op., 2/15/17, at 45) (concluding that involuntary termination of parental rights is warranted based on the entire record). Accordingly, we affirm on the basis of the trial court's opinion.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/18/17

IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION

IN RE: T.R.R.                                          :
                                                       :        2014-A9008-36
INVOLUNTARY TERMINATION OF H.J.W.                      :
INVOLUNTARY TERMINATION OF L.R., Jr.                   :

## OPINION

### I.  INTRODUCTION

H.J.W. (aka H.J.R.) and L.R., Jr. (hereinafter "Mother" and/or "Father" respectively, or the "Parents") are the biological parents of T.R.R. (hereinafter "Child"). By Final Decrees and Opinion dated February 15, 2017, we granted the Petitions of the Bucks County Children and Youth Social Services Agency (hereinafter the "Agency") to involuntarily terminate Mother's and Father's parental rights as to T.R.R.. Mother and Father have both filed timely appeals from our decision to the Superior Court.

Our comprehensive Opinion jointly addressed the Agency's Petitions as to both Mother and Father, as their circumstances are inextricably combined. In fact, on June 14, 2015, well into the six (6) year period during which the Agency was involved with this family, Mother and Father married.

While the respective appeals filed on behalf of Parents have been assigned separate, but related, docket numbers by the Pennsylvania Superior Court (Mother at 918 EDA 2017, filed on March 22, 2017, and Father at 948 EDA 2017, filed on March 24, 2017), we again address these matters in a joint Opinion, to be filed under each docket number in the Superior Court.

1

## II. STATEMENTS OF MATTERS COMPLAINED OF ON APPEAL

### A. Mother's Statement of Matters Complained of on Appeal

We recite Mother's Statement of Matters Complained of on Appeal, *verbatim*, as follows:

1. The trial court erroneously granted BCC&Y's petition to terminate the parental rights of natural mother as BCC&Y's failed to prove repeated and continued incapacity, abuse or neglect on the part of Mother as required § 2511(a)(2).

2. The trial court erroneously granted BCC&Y's petition to terminate the parental rights of Mother as it failed to prove that the services or assistance reasonably available to her did not remedy the conditions which lead to the placement of T.R.R.

3. The trial court erroneously granted BCC&Y's petition to terminate the parental rights of natural mother under § 2511(a)(8) as there is no competent evidence that the conditions which led to the removal or placement of the child continue to exist as to Mother.

### B. Father's Statement of Matters Complained of on Appeal

We recite Father's Statement of Matters Complained of on Appeal, *verbatim*, as follows:

1. The trial judge erred and abused his discretion in determining that the Bucks County Children and Youth Social Services Agency (the "Agency") had met its burden of proof as to the termination of Father's parental rights.

2. The trial judge erred in effectively requiring Father to carry the burden of proof with regard to his capacity to parent, when Agency had the burden of proving by clear and convincing evidence that Father lacked capacity to parent and where the Agency's competency evaluator, Dr. Weinstein, testified that Father was not incapable of parenting his son.

3. The trial judge erred in finding that Father lacks capacity to parent and that such incapacity is irremediable, in the absence of any evidence presented by the Agency to support said conclusions.

4. The trial judge erred in failing to examine and/or give weight to the Agency's lack of reasonable efforts to provide Father appropriate supports, given the undisputed fact that the Agency's competency evaluation indicated Father had capacity to parent so long as he was provided training, support and increased visitation with his son.

3[sic] The trial judge erred in finding that Father did not achieve the objectives of the Agency's Permanency Plan when the record indicted otherwise and where the Agency and dependency court judge found that Father had done everything necessary pursuant to the Permanency Plan .

4[sic] The trial judge erred and abused his discretion in finding that Father lacked capacity to parent based on the Agency's testimony that Father struggled with giving his child personal space, failed to speak quietly, and resisted Agency prompts to address his hygiene; said justifications do not rise to the level of irremediable incapacity to parent.

5[sic] The trial judge erred and abused his discretion in terminating Father's parental rights when Father has consistently made a sincere effort to reunify with his child and took full advantage of the services offered to improve his parenting, while meeting the child's needs during the permitted visitation periods.

6[sic] The decision of the trial judge erred and abused his discretion in making a determination that was against the weight of the evidence.

## III.   DISCUSSION

Undeniably, this is an extraordinary, emotionally wrought case. We certainly understand Parents' desire to pursue this appeal. Nonetheless, the lengthy record of the eleven (11) days of hearings confirmed, clearly and convincingly, that Mother and Father were regrettably unable to remedy the parental incapacity which brought now eight (8) year-old T.R.R. into the Agency's care and control more than six (6) years ago.

In our comprehensive forty-five (45) page Opinion, which we attach hereto as Exhibit A, we extensively considered whether the Agency, as the party seeking termination, met its burden of proof and established by clear and convincing evidence that persuasive grounds existed for terminating Mother's and Father's parental rights. We found that the Agency did so. Our Opinion fully addresses all of the Matters Complained of on Appeal as respectively articulated by Mother and Father. Accordingly, we request that the Superior Court refer to our Opinion of February 15, 2017, as fully responsive to the issues raised by both Parents in the instant appeal.

3

## IV. CONCLUSION

For all of the reasons noted above, we respectfully submit that our Final Decrees of February 15, 2017, granting the Agency's Petitions to Involuntarily Terminate Mother's and Father's Parental Rights as to the Child, T.R.R., should be affirmed.

BY THE COURT:

4/3/19
Date

_____
GARY B. GILMAN,            J.

4

A copy of this Opinion has been sent to the following on April 3, 2017:

Brad M. Jackman, Esquire
JACKMAN LAW
107 North Broad St.
Doylestown, PA 18901
Bucks County C&Y

Lisa Horne, Esquire
1260 Almshouse Rd., Bldg. G, 4th Fl.
Doylestown, PA 18901
Guardian Ad Litem

Francine W. Kaplan, Esquire
KAPLAN LAW OFFICES
309 Fellowship Rd., Ste. 200
Mount Laurel, NJ 08054
Atty for H.J.W. aka H.J.R.

Jessica L. VanderKam, Esquire
STUCKERT & YATES
2 North State St.
Newtown, PA 18940
Atty for L.R., Jr.

Barbara – Bucks County Law Library

Kelly Neff, Bucks County Law Reporter

Fiduciary Reporter

**IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA**
**ORPHANS' COURT DIVISION**

IN RE: T.R.R.                                         No.: 2014-A9008

## FINAL DECREE and OPINION

### I.    INTRODUCTION

H.J.W. and L.R., Jr. (hereinafter "Mother" and/or "Father" respectively, or the "Parents") are the biological parents of T.R.R. (hereinafter "Child"). This case presents a truly heart-wrenching situation, involving biological parents who face intellectual and other challenges, but who obviously love their young son. At the same time, there are foster parents who are stunningly dedicated and loving, and a now-eight (8) year old child who has been stuck in limbo, as he has struggled to live his daily life and to grow up in a physically, emotionally, and psychologically healthy manner.

All of this pathos is set against a backdrop of a Bucks County Children and Youth Social Services Agency (hereinafter the "Agency") which initially made yeoman-like efforts to provide appropriate supports, so that the biological parents would have a fighting chance to continue to parent their son. Later, the Agency would essentially abandon those efforts.

By the issuance of the Final Decrees attached hereto, we grant the Petitions of the Agency to involuntarily terminate Mother's and Father's parental rights as to T.R.R..

### II.    PROCEDURAL BACKGROUND

T. R. was born on May 7, 2008. A Shelter Care hearing was held on December 20, 2010, before the Honorable Robert O. Baldi of this bench. The Adjudicatory Hearing was continued until January 14, 2011 at which time T.R.R. was adjudicated dependent and formally placed in the legal

1

EXHIBIT A

and physical custody of the Agency. T.R.R. has remained in foster care ever since, a time period of more than six (6) years.

On September 11, 2012, the permanency goal was formally changed, by agreement of the Parents, from reunification to adoption. Mother and Father were individually represented by separate counsel at the goal change hearing.

On January 14, 2014, the Agency filed for Involuntary Termination of Parental Rights of Mother and Father pursuant to Sections 2511(a)(2), (5) and (8) of the Adoption Act. Seven (7) months earlier, on June 14, 2013, Mother had signed a Consent for the Adoption of Child, along with a form describing Conditions Related to Consent. (N.T. 8/27/15, p. 13). On March 28, 2014, a hearing was held wherein Father entered into a Voluntary Relinquishment of his Parental Rights. (N.T. 8/27/15, p. 51-54). On April 4, 2014 we entered a Decree terminating Father's parental rights and on April 29, 2014, we entered a Decree terminating Mother's parental rights pursuant to our confirmation of Mother's previously executed Consent.

Subsequently, both Mother and Father, in separate, *pro se,* letters, contacted this Court. We viewed the correspondence received as, essentially, timely filed appeals by Parents seeking to withdraw their respective consent and voluntary relinquishment. Accordingly, on April 29, 2014 and May 9, 2014, we vacated the termination Decrees previously entered on April 4 and April 29, 2014 as to Father and Mother, respectively. Our Decrees vacating the termination Decrees encouraged the Agency to seek timely re-hearings as to these circumstances, which were unusual both procedurally and substantively.

Rather than seeking re-hearings, the Agency and Guardian Ad Litem appealed our vacation of the original termination Decrees to the Superior Court of Pennsylvania.[1] The Superior

---

[1] We authored Opinions in support of our decisions as to Mother and Father. The Opinion as to Father can be found at 87 Bucks Co. Rep. 647 (2014). The Opinion as to Mother, issued four (4) weeks later, was not published.

Court, in a memorandum opinion, quashed those appeals and on February 13, 2015, remanded the record back to this Court.

Subsequent to the Superior Court's remand, on October 28, 2015, the Agency filed for a hearing as to both parents, and the matter was relisted.[2] The evidentiary hearings spanned eleven (11) days over a one year time period. Hearings were conducted on August 27, 2015, January 11, 2016, January 12, 2016, March 10, 2016, April 27, 2016, April 28, 2016, May 3, 2016, May 16, 2016, May 17, 2016, July 18, 2016 and August 27, 2016.

Following receipt of all hearing transcripts, the parties submitted proposed findings of facts, conclusions of law, and legal memoranda to this Court. We now offer the following Opinion and Decrees in support of our decision.

## III. FACTUAL BACKGROUND

This family and the Agency have a considerable history, which began on March 10, 2010, when the Agency received a referral pertaining to fighting between Mother's older two sons, T.R.R.'s half-brothers.[3] At that time, the Agency initiated a case through its General Protective Services Unit and began supporting Mother by implementing assistance through Tabor Services for several months, from August through October 2010. At the end of November 2010, Mother travelled to California, leaving one of the older children with her grandmother, and leaving the other boy, along with T.R.R., in the care of Father. (N.T. 7/18/16, p. 60). During Mother's trip to California, following a visit to Father's home by his probation officer, the Agency was notified by

---

[2] Given the unusual procedural history of this matter, on or about October 28, 2015, the Agency filed another Petition to Involuntarily Terminate Mother's Parental Rights, reserving the right to argue that Mother's prior consent was valid and should be confirmed.

[3] Mother refused to participate in parenting classes, as requested by the Head Start program that her older two sons attended. Both boys were ultimately adjudicated dependent, and on December 27, 2010, legal physical custody was placed with their biological father, a resident of Butler County. (N.T. 4/27/16, p. 121).

3

the police that Father's home was unsafe.[4] The December 20, 2010 Shelter Care hearing, and the remainder of the procedural history outlined above, followed that incident.

During the course of the hearings we were presented with extensive testimony and evidence from individuals involved with the Parents and Child. We heard testimony from various Agency caseworkers, as well as testimony from caseworkers affiliated with other organizations that have participated in different capacities with this family. We received testimony from experts and from the present foster parents. Finally, we heard the testimony of Mother and Father.

## IV.  DISCUSSION

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101–2938, which requires a bifurcated analysis, as follows:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

In re Adoption of C.D.R., 111 A.3d 1212, 1215 (Pa. Super. 2015) citing In re L.M., 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Here the Agency pursued termination pursuant to §2511 (a)(2), (5), and (8) which provide in pertinent part as follows:

(a)    General rule. – The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

---

[4] At that time, Father was under the supervision of a probation officer following a criminal conviction for arson, to be discussed *infra*.

4

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

As the party seeking termination, the Agency bore the burden of establishing by clear and convincing evidence that grounds existed for terminating Mother's and Father's parental rights. Clear and convincing evidence means testimony that is so "clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." In re M.M., 106 A.3d 114, 117 (Pa. Super. 2014) (internal citations omitted)

"[T]he complete and irrevocable termination of parental rights is one of the most serious and severe steps a court can take, carrying with it great emotional impact for the parent and the child." In re C.P. 901 A.2d 516, 520 (Pa. Super. 2006). "Because of the importance placed on the family unit, governmental intrusion into the family, and disruption of the parent-child relationship, is warranted only in exceptional circumstances," and "only upon a showing of clear necessity." Even when such intrusion is necessary to protect the children, every possible effort must be made to reunite the family. In addition, all circumstances must be considered when analyzing a parent's performance or non-performance of parental obligations. A parent's performance must be

5

measured in light of "what would be expected of an individual in circumstances which the parent under examination finds himself." In re Matsock, 611 A2.d 737, 742-743 (Pa. Super. 1992) (internal citations omitted).

In reaching a decision following a termination proceeding, the trial court's initial focus is on the conduct of the parent and whether his or her conduct justifies termination of parental rights pursuant to the pertinent statutory provisions. In re B.L.L., 787 A.2d 1007 (Pa. Super. 2001). Only if the statutory grounds for termination are established, pursuant to §2511(a), does the welfare of the child become the court's paramount consideration, and the court must reflect on whether termination will best serve the child, focusing on the developmental, physical, and emotional needs and welfare of the child pursuant to §2511(b).

Following the lengthy hearings in the present case, and upon careful and laborious consideration of all of the testimony and evidence presented, we determined that the Agency met its burden of demonstrating clear and convincing evidence to support the termination of Mother's and Father's parental rights.

The following pertinent facts were developed at the evidentiary hearings.

### A. THE AGENCY PRESENTED CLEAR AND CONVINCING EVIDENCE IN SUPPORT OF TERMINATING THE PARENTAL RIGHTS OF MOTHER AND FATHER PURSUANT TO SECTION 2511(a)(2) OF THE ADOPTION ACT.

Pursuant to Section 2511(a)(2) of the Adoption Act, termination of parental rights is permissible if the following three elements are met:

> (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. In re Adoption of M.E.P., 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted).

> The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those

6

grounds may include acts of refusal as well as incapacity to perform parental duties. In re A.L.D., 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

In re Adoption of C.D.R., 111 A.3d 1212, 1216 (Pa. Super. 2015).

It is clear that in a termination proceeding, the focus is on the conduct of the parents. In re B.L.W., 843 A.2d 380, 383 (Pa. Super. 2004). The statute does not require incapacity, abuse and neglect in order for a court to terminate parental rights. It clearly states one condition or the other must be present. If the court finds that there is clear and convincing evidence to establish that the probability of a parent performing his or her parental duties is very low, the court may terminate parental rights. In re Adoption of Michael J.C., 486 A.2d 371, 375 (Pa. 1984). As our Supreme Court explained in the aforementioned case, while explicating § 2511(a)(2):

> when a parent has demonstrated a continued inability to …provide a safe environment for a child… and the behavior of the parent is irremediable as supported by clear and competent evidence, the termination of parental rights is justified.

In re Z.P., 994 A.2d 1108, 1118 (Pa. Super. 2010).

In the instant case, the Agency has alleged that Mother and Father are incapable of parenting their child. In order to terminate the parental rights of Mother and Father, the court must not only find incapacity, but it must also find that the conditions which caused the parents' incapacity are irremediable. We have found that to be so in this case. Parents have not and cannot remedy the incapacities which existed and caused T.R.R. to originally come into the Agency's care in 2010.

**1. Agency caseworker Bonnie Ference, who has earned substantial relevant professional qualifications, presented extensive testimony regarding Parents' inability to remedy their incapacities.**

Ms. Ference, an Agency caseworker in the foster care unit, has been employed by the Agency for nine and one half (9 ½) years. She has extensive relevant credentials, including a

7

bachelor's degree in elementary education, a master's equivalency in education, and a master's degree in counseling. (N.T. 3/10/16, p. 36). Her pre-Agency professional experience includes twelve (12) years of teaching first grade and pre-first grade in public school, and four (4) years teaching pre-school. After teaching, Ms. Ference became a parenting educator and parenting specialist, a field in which she worked for nine (9) years. As a parenting specialist she worked with parents involved with Lehigh County's Children and Youth Agency. (N.T. 3/10/16, p. 36). Ms. Ference was the direct Agency caseworker for this family for one and one-half (1 ½) years, from March of 2011 until September of 2012. (N.T. 3/10/16, p. 37).

According to Ms. Ference, the reasons which initially necessitated T.R.R.'s removal from his home were Mother's failure to cooperate with Agency services, her failure to cooperate with Tabor's family preservation services for her older two sons, Mother's untreated mental health issues, Father's behaviors resulting from stress and untreated mental health issues, and Father's anger issues. (N.T. 3/10/16, p. 39).

Ms. Ference testified that she worked with Mother and Father on their efforts toward reunification with T.R.R. (N.T. 3/10/16, pp. 35, 37). In her professional experience, she has worked with other parents, like Mother and Father, "who were reluctant to follow directives...had anger issues, mental health issues." (N.T. 3/10/16, pp. 40-41).

Ms. Ference testified that Father's probation officer had determined that Father's home presented safety issues for T.R.R.. Indeed, upon a visit to the home, the probation officer had found Father's psychiatric medication scattered all over the floor of the residence, and observed that "Father did not seem concerned that a 2 ½ year old would pick them up." (N.T. 3/10/16, p. 39). In January 2011, shortly after T.R.R. came into the care of the Agency, Father was evicted from his home, and he thereafter lived with his grandparents or his brother. (N.T. 3/10/16, p. 87).

8

Ms. Ference cited further examples of inadequate parenting, including facts that at the time of T.R.R.'s removal from the custody of Parents, he had rotted teeth, was in need of leg braces, displayed significant speech and physical delays, and was in need of early intervention services. (N.T. 3/10/16, p. 39).

Ms. Ference testified that both parents needed parenting education. (N.T. 3/10/16, pp. 38-40). Recognizing that she was introducing a large amount of information to the Parents, Ms. Ference used a previously prepared binder to provide visual clues, which in her experience educating foster parents and biological parents, she has found to be a helpful resource. The binder, used in addition to verbal instructions, is intended to provide an understanding of standard procedures and the overall program after the Agency becomes involved with a family. (N.T. 3/10/16, pp. 38-40, 45, Exhibit CY-4).

Ms. Ference testified that she consistently focused on assisting the Parents as to how they could help T.R.R. focus on one item or one task at a time during parental visits. Ms. Ference cited examples from visits, where she observed that Parents would involve T.R.R. in many activities at once and combine them with snack time as well. She addressed with Parents the need to help T.R.R. focus his attention on one activity at a time, which will become especially important as he reaches school age. She explained her rationale: "Because he has developmental delays and he's going to need to learn how to focus his attention so that he can learn and hopefully offset those delays." (N.T. 3/10/16, p. 55). She repeatedly spoke with the Parents about allowing T.R.R. to finish playing with one object before another was introduced. She also introduced Parents to the importance of T.R.R. sitting properly at snack time, with no other toys on the table, so that he would not choke. (N.T. 3/10/16, pp. 54-55).

9

Ms. Ference testified that prior to each visit with their child, she provided the Parents with prompts as to what she would like to see them achieve. (N.T. 3/10/16, p. 55). Additionally, she instructed the parents about following through if they had made a promise to T.R.R., so as not to disappoint him. She described that sometimes the Parents would "follow through;" however, they were "very inconsistent." (N.T. 3/10/16, pp. 57, 157). Finally, she provided assistance and guidance to improve the overall interaction between T.R.R. and Mother and Father. (N.T. 3/10/16, pp. 54-58). Ms. Ference testified that Mother would respond to her cues, but that Father would forget until Mother prompted him. At other times, both Parents would forget and return to "old habits." (N.T. 3/10/16, p. 55). Ms. Ference noted that Father had difficulty retaining the lessons she taught him, and she often had to restart a lesson. (N.T. 5/3/16, p. 83). Ms. Ference also observed that at "[M]ost of the visits [Mother] was very detached, with her cell phone or her finger nails or things like that. Sometimes she engaged in playing." (N.T. 4/27/16, p. 116).

According to Ms. Ference, Mother and Father failed to pick up on the cues given by T.R.R.. (N.T. 3/10/16, p. 62). She cited the example of being in a very warm room and T.R.R. becoming flushed, but neither parent contemplating removing T.R.R.'s jacket. (N.T. 3/10/16, p. 62). Another example was of a visit which occurred after T.R.R. had begun to express some frustration with the visits, and he arrived at the visit exhibiting a tic, which involved constant blinking and shaking of his head. When asked if they noticed anything about T.R.R. at the end of the one (1) hour visit, Parents commented that T.R.R. was "moody" that day. When asked specifically about the blinking, both Parents stated that they did not notice it. (N.T. 3/10/16, pp. 62-63).

Ms. Ference also worked with Parents on cooperating and complying with services provided to them, including supervised visitation services provided by Bethanna, and intensive

10

reunification services provided by Links. (N.T. 3/10/16, p. 58). According to Ms. Ference, each time another service was implemented, Parents would question why T.R.R. was in care, and she would review the Permanency Plan with the Parents again, discussing why T.R.R. had come into the care and custody of the Agency. (N.T. 3/10/16, p. 58). "[F]or an ongoing time, they [Parents] didn't even know why he came into care."

Ms. Ference also testified that while the Parents were compliant as to attending T.R.R.'s doctors' appointments, their participation was limited. She cited an example of an appointment with a developmental pediatrician when during the doctor's eliciting background information, specifically regarding seizure type behavior that T.R.R. had exhibited, neither Parent shared any relevant family history. Only following Ms. Ference's prompt to do so, did Father share that he experiences seizures and that his grandmother had experienced seizures as well. (N.T. 3/10/16, p. 98).[5]

Ms. Ference testified that she did not believe Parents appreciated the extent to which T.R.R. was physically demonstrating his anxieties, and she testified that she discussed with Parents, "over and over again" that T.R.R. was very troubled by the parental visits. (N.T. 3/10/16, pp. 63-64). Ms. Ference suggested that they reduce parental visits to every other week, as an "experiment" to see if that would alleviate T.R.R.'s behaviors. Mother agreed more quickly than Father, who eventually also agreed to the decreased frequency of visits. Neither parent ever asked Ms. Ference for tips on parenting. (N.T. 3/10/16, p. 64).

> 2. **Due to Father's intellectual disabilities, Mother and Father need to work as a team to adequately provide for T.R.R.. Father admits that he cannot care for T.R.R. alone. However, Mother repeatedly thwarted this parental team work opportunity by failing to comply with the prerequisite mental health treatment required by the Agency.**

---

[5] Ms. Ference referred to Father's grandmother having seizures, and in testifying about this same incident, Father referenced his mother. This factual inconsistency is irrelevant to our decision in this case.

Ms. Ference testified about a meeting in January 2012, which was attended by her, an Agency supervisor, Father's attorney, Mother's attorney (by telephone), and the *Guardian Ad Litem*. Ms. Ference testified that "it was stated very clearly that the Agency, based on records and whatnot, did not feel that Mr. R. would be able to parent on his own, but that we would put in the stipulation that if [Mother] was the supervisor, that we could return the child home with the stipulations again that she went for therapy to address her reticence, her resistance, to making changes and some tendency to think people were picking on her. And also to address the fact that we wanted to make sure that she would follow through with the supervision of [Father]." (N.T. 3/10/16, pp. 66-67). Ms. Ference testified that Father was told his reunification with T.R.R. was contingent upon Mother complying with certain requirements. Importantly, Father agreed that he could not parent T.R.R. alone and that he needed Mother's assistance. (N.T. 3/10/16, p. 106, N.T. 5/3/16, p. 92, Exhibit F-6). Father and Mother were not living together at that time. (N.T. 5/3/16, p. 110).

To implement the Agency's plan, a referral was made to Ravenhill for Mother's mental health therapy. Ravenhill reported that Mother would not respond to their repeated outreach. Mother did approach Ravenhill after Ms. Ference reminded her that her participation was an integral part of their agreement. "[Mother] went to the evaluation but was not cooperative...was not able to admit that she had any problems. That she didn't know why she was there even though we had talked about it. And the interviewer [from Ravenhill] said she was not a candidate for their services," as Mother maintained that she did not have any issues that needed to be addressed. (N.T. 3/10/16, p. 67, 4/27/16, pp. 86-87).

Mother's resistant attitude prevented the implementation of Ravenhill's practice of setting goals and working toward achieving those goals with Mother. (N.T. 3/10/16, p. 67). Ms. Ference

acknowledged that there may have been other provider options, but the Agency did not pursue other options, despite Mother's request to do so, because the program at Ravenhill is intensive and it was the program that had been agreed upon. Ms. Ference testified that Mother's failure to pursue the agreed upon services was another example of Mother's oppositional behavior. (N.T. 4/27/16, pp. 87-89).

Ms. Ference acknowledged that the Agency maintained the position that Father was doing all that he was capable of doing, in terms of meeting Agency objectives. "[Father] was trying to the best of his ability, but he lacked understanding. He had difficulty remembering what he was told, which was validated by the services that were in place. So he was trying. But we recognized the fact that he could not do it on his own." (N.T. 3/10/16, p. 106)[6]. It was undeniable that Mother and Father were going to have to function as a team with regard to parenting T.R.R. (N.T. 5/3/16, pp. 126-129).

Ms. Ference explained that Mother failed to comply with "an evaluation to address her oppositional behaviors and her behaviors to not be able to recognize that she had weaknesses or had needs." (N.T. 4/27/16, p. 86). Since Mother was to supervise Father, but Mother failed to pursue mental health evaluation and treatment as agreed, the value of Father's parenting efforts was substantially diminished. (N.T. 3/10/16, pp. 119-120). Once Mother failed to comply with "her part of the plan," the Agency's position was that there was no reason to pursue further efforts on behalf of Father, because Father's reunification possibilities were contingent upon Mother, and [Mother] "did not follow through on her part of the plan." (N.T. 5/3/16, p. 112). Ms. Ference

---

[6] Ms. Ference acknowledged that the Dependency Court had ordered parental capacity examinations for Parents. (N.T. 4/27/16, p. 82). She further acknowledged that despite Father's diagnosis of intellectual disabilities, no referrals were made to agencies that could have provided more specialized assistance, as opposed to traditional providers. (N.T. 4/27/16, pp. 84-85).

13

testified further that despite the recommendation of Dr. Weinstein, discussed further, *infra.*, that Father could benefit from more intensive and frequent parenting sessions, Father's visits with T.R.R. were reduced by the Agency at that time. (N.T. 5/3/16, pp. 112-115). Ms. Ference testified that the visit reduction was mandated by the Agency because T.R.R. was struggling emotionally and behaviorally with the visits. Ms. Ference also stated that despite Dr. Weinstein's recommendations, until Mother cooperatively attained the guidance which the Agency was seeking of her and Father, the Agency was not at the "point in the process" to provide the types of environmental and emotional supports for Father that Dr. Weinstein recommended. (N.T. 5/3/16, pp. 126-127).

Finally, Ms. Ference testified as to Exhibit F-19, the Notice and Summary for Interim Permanency Review, dated May 15, 2012. This document was prepared in anticipation of the Permanency Review hearing which was conducted before the Dependency Court on June 12, 2012. Mother and Father, their respective counsel, and the *Guardian Ad Litem*, each received a copy of this report. (N.T. 5/3/16, p. 151). Among the many issues and concerns detailed in the document, Ms. Ference highlighted examples such as Mother ignoring Father when he referred to rules that needed to be followed, or Mother assuming less responsibility than Father for the care of T.R.R. during visits. These were noted as concerns by Ms. Ference, since Mother was "the projected caregiver for T.R.R. if he is reunified with his family." (N.T. 5/3/16, pp. 158-159). Three months later, in September 2012, Ms. Ference's involvement as the caseworker ended, and the goal was changed, by agreement of the Parents, from reunification to adoption. (N.T. 3/10/16, p. 65, N.T. 5/3/16, p. 160).

14

3. **The testimony of Agency supervisor Jennifer Horn supported the conclusion that Parents' incapacities, which caused T.R.R. to come into Agency care initially, were incapable of being remedied.**

Ms. Horn, a supervisor in the Intensive Services Unit (ISU) of the Agency, has had direct involvement with this case for several years. Specifically, she was responsible for supervising two of the prior caseworkers on this matter, and she assumed the role of direct caseworker when a previous caseworker left the employment of the Agency. (N.T. 5/16/16, pp. 12-16).

Ms. Horn's testimony was aligned with other significant testimony. She reiterated that T.R.R. came into the care of the Agency in December 2010 and has remained in care since that time. (N.T. 5/16/16, p. 16). She testified that the issues involving T.R.R.'s removal from his parents involved both Mother and Father. Ms. Horn recalled the incident of December 2010, when T.R.R. was two (2) years old, and, in Mother's absence, was in the physical custody of Father. She cited the incident when the Agency visited Father's apartment and the Agency caseworker found Father's "home in extreme disarray with mental health medication scattered throughout the apartment." (N.T. 3/10/16, p. 82, Exhibit F-11.) Ms. Horn testified that when T.R.R. came into care, he had developmental delays, issues with his leg, and needed dental work. (N.T. 5/16/16, pp. 16, 18).

T.R.R.'s visitation with his parents began in 2011 and continued until April of 2014. (N.T. 5/16/16, p. 21). Notably, Ms. Horn acknowledged that at no time was T.R.R. ever mistreated by his parents. However, she reported that the Agency was concerned about the lack of attachment between T.R.R. and his parents, and was also concerned about Mother and Father's parenting skills. (N.T. 5/16/16, pp. 21-23).

Reviewing the Agency records, Ms. Horn testified that the Parents had not pursued, through Dependency Court, the return of T.R.R. to their care. (N.T. 5/16/16, p. 25). In June 2013,

15

Mother signed a consent to adoption, which she did not revoke within thirty (30) or even sixty (60) days after she executed it. (N.T. 5/16/16, p. 25). In March 2014, Father voluntarily relinquished his parental rights. (N.T. 5/16/16, p. 26). After these decisions by the Parents, Ms. Horn stated that the Agency pursued its discretionary right to halt visits between Parents and T.R.R.. Ms. Horn testified that a "closing visit" was held in April of 2014, during which it was explained to T.R.R. that Mother and Father's parental rights had been terminated and a subsequent adoption would be occurring. (N.T. 5/16/16, pp. 26-27). One year later, in April 2015, following this Court vacating the termination of both Parents' rights, a permanency review hearing was held in Dependency Court. Parents were instructed that they could ask the Court for visitation. They did not do so. (N.T. 5/16/16, p. 27). Neither parent asked for visits with T.R.R. for two (2) years, until April of 2016. (N.T. 5/16/16, pp. 27-28). Since the April 2014 closing visit, the Agency has received from Parents approximately six (6) to eight (8) letters and gifts for T.RR., including a birthday gift and an Easter basket. (N.T. 5/16/16, p. 111). We are concerned about information which we heard from Ms. Horn, that while T.R.R. was given the gifts, he was not told that they were from his Parents, nor was he given Parents' letters directed to their son. (N.T. 5/16/16, pp. 111-112). While we understand the Agency's position that the gifts and letters may have served as "triggers" to heighten T.R.R.'s anxiety and associated behaviors, we do not condone such conduct on the part of the Agency.

Ms. Horn testified that T.R.R. has hoped, for an extended period of time, to be adopted by his Foster Parents and to no longer be in foster care. He wishes to be a permanent part of that family, and to share their last name. Ms. Horn testified that T.R.R.'s wishes for his future has been discussed with Mother and Father, who fail to recognize what T.R.R. wants, and who fail to appreciate the impact upon T.R.R. of the lengthy passage of time without permanence. (N.T.

16

5/16/16, pp. 28-29). Ms. Horn testified that her extensive involvement with this family supports the Agency's position that Mother and Father could not meet T.R.R.'s needs when he came into the care of the Agency in 2010, and that they still cannot meet his needs today. (N.T. 5/16/16, p. 30).

4. Testimony and evidence offered by collaterally related resource providers corroborated the Agency's position as to Mother's and Father's inability to adequately remedy ongoing parental incapacities.

a. LINKS Family Reunification Program - testimony of program coordinator

We heard testimony from Jennifer Santiago, who is employed by Family Services Association and is the supervisor of the LINKS program. (N.T. 1/11/16, p. 15). Ms. Santiago explained that LINKS is a fifteen (15) month reunification program which begins when a child is placed outside of the home. In this case, LINKS began working with Mother and Father in December of 2010. (N.T. 1/11/16, p. 16). Ms. Santiago testified that Mother and Father also participated with an Agency parent educator and that as of April 2011, they had completed additional parenting classes through the Agency. (N.T. 1/11/16, pp. 27-28, Exhibit F-1). LINKS worked with Mother and Father on parenting skills, developmental expectations, discipline, age appropriate interactions with T.R.R., financial management skills, impulse control, and personal hygiene. (N.T. 1/11/16, p. 17). Ms. Santiago testified about the March 14, 2012 "Case Synopsis" prepared at the conclusion of Mother and Father's involvement with LINKS. LINKS' conclusions as to Parents' involvement were as follows: "[Parents] had achieved minimal success in achieving the objectives and goals as set forth in the original and revised permanency plans. (N.T. 1/11/16, pp. 19-22, Exhibit CY-3).

17

**b.**      **Pinebrook Family Answers – testimony of foster care caseworker**

We heard the testimony of Elizabeth Flores, a foster care caseworker employed by Pinebrook Family Answers. Ms. Flores was assigned by the provider agency and has had regular contact with T.R.R. and Parents, as she was responsible for T.R.R.'s transportation to and from family visits, commencing with T.R.R.'s placement in a Pinebrook foster home in July of 2011. (N.T. 1/11/16, pp. 140-41).

Ms. Flores testified that while she presently sees T.R.R. biweekly, she has, at times, seen him weekly over the years. (N.T. 1/11/16, pp. 140-41, N.T. 1/12/16, p. 5). Ms. Flores noted that T.R.R. had a few disrupted foster home placements prior to being placed in his first Pinebrook foster home from July 1, 2011 until September 23, 2011. (N.T. 1/11/16, pp. 140-141). Ms. Flores stated that when she first met T.R.R. she was aware of his developmental delays, and the first Pinebrook foster parents reported significant behavioral concerns, particularly after visits with Mother and Father. (N.T. 1/11/16, pp. 142-143). Ms. Flores recalled that after the initial foster home placement failed, T.R.R. moved to his second Pinebrook foster home on September 23, 2011, and has remained in that home to this day. (N.T. 1/11/16, p. 141).

Ms. Flores testified that despite his prior foster placements being unsuccessful, T.R.R. was immediately happy and content when he moved to his current foster home. (N.T. 1/11/16, p. 144). According to Ms. Flores, T.R.R. never spoke with her about his biological parents, or his visits with them. (N.T. 1/11/16, p. 141). When it was noticed that T.R.R. was exhibiting negative behaviors surrounding family visits, Ms. Flores attempted to speak with T.R.R. about his "acting out." She stated he would say "no" and kick his shoes off, and she witnessed his anxiety-laden behavior when she would pick him up just prior to family visits. (N.T. 1/11/16, pp. 145-147, 154).

18

Ms. Flores noted that T.R.R. was more positive about attending visits when he expected a gift from his Parents, or he looked forward to food items that he had requested. (N.T. 1/11/16, p. 148).

Ms. Flores cited a discussion she had with T.R.R. during transport to a parental visit. She had observed T.R.R. spitting, hitting and head-butting the Foster Mother before the visit with his parents, and he became aggressive toward the foster sibling as well. During their trip, Ms. Flores discussed the unacceptability of those behaviors with T.R.R.. According to Ms. Flores, T.R.R. expressed that he "hated' his Foster Mother because she made him attend the visits. (N.T. 1/11/16, pp. 155-156, N.T. 1/12/16, p. 73).

In describing her observations of the visits, Ms. Flores testified that Parents often did not follow through with a game or activity during their visits with T.R.R. (N.T. 1/11/16, pp. 148-150). She observed that T.R.R. would occasionally accept affection from Mother, less so from Father, and on occasion T.R.R. was noticeably resistant to affection from Father. (N.T. 1/11/16, pp. 151, 167-170, N.T. 1/12/16, pp. 123-124). Ms. Flores testified that she addressed "boundary issues" with Father, explaining how to respond to cues from T.R.R. about allowing him physical space, not speaking too loudly, being aware of personal hygiene, reading cues, following through on promises, playing and engaging with T.R.R. on his level, and showing interest in T.R.R. (N.T. 1/11/16, pp. 152-153, 167-171). Ms. Flores testified that she had to provide "constant reminders" on those issues. (N.T. 1/11/16, pp. 153-154, 170-171).

Ms. Flores testified that Father would not accept responsibility for any negative interactions that occurred at the visits, which Ms. Flores would document in her quarterly reports. Ms. Flores explained that when she tried to address the ongoing issues with Father and his overall lack of progress, Father would blame others; Father blamed the foster parents for speaking negatively to

19

T.R.R. about visits, and he blamed Ms. Flores for his lack of a bond and satisfactory relationship with T.R.R. (N.T. 1/11/16, pp. 168-171).

Ms. Flores noted that Parents failed to engage T.R.R. about his life. For example, Parents failed to ask him about school or how his days were, despite her encouraging them to do so. According to Ms. Flores, after approximately one and one-half (1-1/2) to two (2) years, when Parents finally became willing to acknowledge the foster family, T.R.R. voiced that he no longer wanted to share information about his foster family with them. (N.T. 1/11/16, pp. 171-172, N.T. 1/12/16, pp. 32-33, 71, 124).

Ms. Flores acknowledged that Father's efforts to interact appropriately with T.R.R. during visits exceeded those of Mother. (N.T. 1/11/16, p. 172). She explained that during discussions about visits, when Father was having difficulty understanding, Mother would provide helpful suggestions, and Father appeared to understand Mother's guidance. However, Mother tended to only interject that sort of constructive involvement during discussions about visits; she unfortunately failed to actively convey such constructive guidance and assistance to Father during visits. (N.T. 1/11/16, pp. 172-173).

This Court was perplexed and disappointed when we heard Ms. Flores' testimony that the Agency never provided her with information that was obtained as a result of the parental capacity exams of Mother and Father. She acknowledged that it would have been helpful to her supervision of Parents if she was aware that Mother had difficulties in processing verbal communication. (N.T. 1/12/16, pp. 66-68). Without this knowledge, Ms. Flores never utilized instructional videos, model behavior, role playing, or picture books to assist Mother with her parenting. (N.T. 1/12/16, p. 68).

Ms. Flores testified that she was not aware that Parents were receiving mixed signals from the various visitation social workers involved in the case. For example, Ms. Flores testified that

20

she informed Father that if he brought a gift or other item to a visit, T.R.R. was to be allowed to take it back to his foster home. In contrast, Ms. Ference, on behalf of the Agency, had previously told Father not to send items (directly or indirectly) to the foster home. (N.T. 1/12/16, p. 93). Ms. Flores also testified that Father was not affectionate with T.R.R.. She acknowledged that her impression could be impacted by the information she was not aware of, specifically, that the Agency was instructing Father to be conscious of T.R.R.'s boundaries. (N.T. 1/12/16, p. 136).

While we recognize that it is generally not our mission to micromanage the manner in which the Agency and its venders perform their very difficult jobs, these mixed messages to Parents and failures by the Agency to openly communicate relevant information to all members of what should have been a "reunification team" are concerning to this Court. We recognize and understand some of the frustrations with the Agency as testified to by the Parents, often particularly poignantly by Father. Nonetheless, it remains clear that Parents' incapacities are, most regrettably, irremediable, regardless of these concerns as to Agency conduct.

According to Ms. Flores, when T.R.R. observed his biological parents in the courthouse, when they were all present for a Dependency Court hearing in April 2015, he required tremendous reassurances that he was not having a parental visit. She described how overwhelming anxiety immediately overcame T.R.R., as he "began to rip at his fingers," and reverted to other anxiety-induced behaviors previously observed. (N.T. 1/11/16, pp. 174-175). Ms. Flores testified that beginning later that evening, the foster family began reporting issues of T.R.R. "acting out" and becoming upset and angry. At a subsequent visit to the foster home, while Ms. Flores and T.R.R. were taking a walk, T.R.R. stated that the foster family was "his family," and he did not want Ms. Flores to remove him and move him again. (N.T. 1/11/16, p. 175).

c.     Elizabeth Benullo – outpatient therapist

We heard testimony from Ms. Benullo, an outpatient mental health therapist associated with Lenape Valley Foundation. Ms. Benullo was offered as a fact witness. We allowed some leeway in Ms. Benullo's brief testimony, provided no expert opinions were offered. (N.T. 5/16/16, pp. 130-137). Ms. Benullo testified that she began meeting with Father in November 2014. (N.T. 5/16/16, pp. 132-133). Ms. Benullo stated that Father has reported to her that he struggles with managing his stress levels. He employs coping skills such as taking walks, using breathing techniques and going to the gym to manage his stress. (N.T. 5/16/16, p. 137). Ms. Benullo related that Father has reported that his major stressor is the ongoing court hearings regrding this matter. (N.T. 5/16/16, p. 140). Father testified similarly, agreeing that he works with Ms. Benullo on his stress, anger, and sometimes his budget. (N.T. 5/17/16, p. 21).

d.     Elizabeth Feist-reunification worker

Elizabeth Feist testified that she is employed by Pinebrook Family Answers as a reunification worker. (N.T. 5/16/16, p. 141). Ms. Feist stated that she was the reunification worker assigned to T.R.R. from December 9, 2011 until October 11, 2012, and was responsible for supervising thirteen (13) visits with T.R.R. and his Parents during that time. (N.T. 5/16/16, p. 142). Ms. Feist testified that she worked with Mother and Father regarding Father's poor hygiene and how Parents should learn to ignore negative behaviors and encourage good behaviors from T.R.R.. (N.T. 5/16/16, p. 144).

5.     **The expert testimony of Dr. Eric Weinstein regarding the results of the evaluations he conducted of Mother and Father in July 2011, supported the Agency's concerns that Parents' incapacities are irremediable.**

Dr. Weinstein, qualified as an expert in the field of clinical psychology, testified that in 2011 he was contacted by the Agency to conduct a parental capacity evaluation of Father. (N.T.

22

4/28/16, pp. 8-9, 16-17, Exhibit F-6). Dr. Weinstein conducted mental health testing, clinical interviews and collateral interviews with Father, the Agency, Bethanna, and Family Service Association of Bucks County. (N.T. 4/28/16, pp. 16-17).

Dr. Weinstein administered the Wechsler Intelligence Test and MMPI-2 to Father, and testified that Father's full score IQ was 58, which falls in the extremely low range. (N.T. 4/28/16, pp. 17-21). Dr. Weinstein explained the impact of Father's results and ensuing classifications. (N.T. 4/28/16, p. 22). He opined that Father's functioning as a parent correlates to the results of the testing, which classified Father as having mild mental retardation. (N.T. 4/28/16, pp. 21-22).

Dr. Weinstein testified further that the MMPI-2 indicated that Father was highly susceptible to stress, which can trigger becoming easily frustrated, resulting in a decrease in ability to function. (N.T. 4/28/16, pp. 22-26). According to Dr. Weinstein, the experience of dealing with the Agency and trying to achieve reunification with T.R.R., was a significant stressor for Father, who very much wanted to be a parent and to reunify his family. (N.T. 4/28/16, pp. 22-23).

Based on his assessment in 2011, Dr. Weinstein testified that, as of that time, Father was incapable of parenting T.R.R. (N.T. 4/28/16, p. 72). Dr. Weinstein's review of various records, among them Agency and medical records, included examples of conduct by Father which Dr. Weinstein described as "poor judgment." (N.T. 4/28/16, p. 76). The doctor testified that Father's poor judgment and limited problem solving abilities could impact his ability to parent. (N.T. 4/28/16, pp. 76-77).

Dr. Weinstein related that Father has a significant history of psychiatric issues and hospitalizations: Father was admitted to Lower Bucks Hospital on October 28, 2008 for a suicide attempt; on November 1, 2008, Father was again admitted to the hospital for a second suicide attempt; on November 16, 2010 Father was admitted to Brook Glenn for anxiety and cutting

23

behavior; and in December of 2010 Father was admitted to Brookhaven for another suicide attempt. (N.T. 4/28/16, pp. 71-72). According to Father, each of these instances were related to legal stressors, court dates and not being with T.R.R.. (N.T. 4/28/16, pp. 72-73).

Dr. Weinstein was aware that in an eight (8) year period Father presented at the hospital emergency room over twenty-five (25) times. (N.T. 4/28/16, pp. 72-73). He explained that Father's distress is exhibited through physical ailments which, in turn, results in Father presenting at the emergency room.

Nonetheless, Dr. Weinstein opined that in 2011, with intervention, there was a "potential or probability" that Father could parent in the future. (N.T. 4/28/16, p. 72). He testified that a parent's cooperation and willingness to accept services is the most important factor in determining the effectiveness of service intervention. (N.T. 4/28/16, p. 72). He recognized that a parent's mental health impacts the efficacy of services. (N.T. 4/28/16, p. 72).

Dr. Weinstein testified that Father's disability classification did not mean that he was incapable of parenting. (N.T. 4/28/16, pp. 28, 34, 71). While he never observed Father and T.R.R. together, nor was he aware of T.R.R.'s particular needs, Dr. Weinstein testified that, at the time when was evaluating Father in 2011, more intensive and consistent training than what the Agency was providing was necessary if Father were to be able to achieve success in parenting and life skills. (N.T. 4/28/16, pp. 30-32, 67, 72). Dr. Weinstein testified that he telephoned the Agency to provide additional information regarding his evaluations of Father. Regrettably, his call was not returned. (N.T. 4/28/16, p. 34).[7] It was Dr. Weinstein's opinion, at the time of the evaluation in July 2011, that Father was incapable of parenting T.R.R.. (N.T. 4/28/16, p. 79).

---

[7] Ms. Ference testified that she did not return Dr. Weinstein's telephone call because at that time the Agency had "already come up with a plan."(N.T. 5/3/16, p. 110). Ms. Ference testified that it had been decided at an earlier meeting that Mother would be evaluated at Ravenhill, address her noncompliance, her oppositionally defiant behavior, and

24

Dr. Weinstein also evaluated Mother. He testified that two indices reflecting Mother's test results fell within the average range and two indices fell within the low average range. (N.T. 4/28/16, p. 42). According to Dr. Weinstein, Mother's test results indicated she performed well regarding perceptual reasoning, meaning she functions and processes better when there is a non-verbal component such as drawings, pictures, or other images to draw connections. (N.T. 4/28/16, pp. 42-43, 47).

Dr. Weinstein's testimony was never refuted by an updated parental capacity evaluation of Father at any of the multiple evidentiary hearings conducted in this case. Likewise, Mother failed to offer an evaluation to demonstrate that she has the present capacity to parent T.R.R..

6.      The testimony of Mother and Father, which confirmed their desires to be reunified with T.R.R., unfortunately also confirmed their inability and/or unwillingness, where relevant, to remedy the incapacities which caused T.R.R. to come into Agency care.

Father, who is presently thirty-four (34) years old, testified that he and Mother have known each other for approximately eleven (11) years. (N.T. 5/17/16, pp. 12, 15-16). They were recently married, on June 14, 2015. (N.T. 5/17/16, p. 16). Mother and Father live in Bristol, Bucks County, Pennsylvania, and as of May of 2016, had been living together for "about six (6) months to one (1) year." (N.T. 5/17/16, p. 12-13).

Father testified that he did not live with T.R.R. prior to the Adjudication of Dependency and placement in foster care; rather, T.R.R. lived with Mother and her grandmother. (N.T. 5/17/16, pp. 26-27). However, Father did stay at Mother's home for the first six (6) weeks of T.R.R.'s life. (N.T. 5/17/16, p. 27). Prior to T.R.R. coming into the care of the Agency, Father would take care of T.R.R. daily while Mother was at work (N.T. 5/17/16, p. 27). Father testified that for the first

---

then the Agency would proceed. However, according to Ms. Ference, unless and until Mother complied, additional accommodations on behalf of Father were irrelevant to the Agency.

two and one-half (2 ½) years of T.R.R.'s life, T.R.R. was always by his side. (N.T. 5/17/16, pp. 31-32).

Presenting an alternative view to Ms. Ference's statement that Father uncooperatively refused to sign the Safety Plan when it was first presented by the Agency (N.T. 3/10/16, p. 82), Father testified that he did not initially sign the Safety Plan because he had not read the document and he does not sign anything without first reading it. (N.T. 5/17/16, p. 74). He stated that despite requesting that the Agency leave him a copy to read, the Agency did not do so, and instead informed him that he was "refusing" to cooperate.[8] (N.T. 5/17/16, p. 75). Father testified that the Agency caseworker subsequent to Ms. Ference reviewed the Family Safety Plan with him, at which time he signed the document. (N.T. 5/17/16, p. 75).

Father stated that he took life skills classes in school, can read and write, and graduated from high school. (N.T. 5/17/16, pp. 13-14). He presently is employed by a company that manufactures light fixtures. (N.T. 5/17/16, p. 15). Father has a driver's license and owns a car. (N.T. 5/17/16, p. 15). He receives Social Security Disability in the amount of $1,628.00 per month for a seizure disorder, restless leg syndrome and tremors. (N.T. 5/17/16, p. 16). Father sees a family doctor, neurologist and therapist. (N.T. 5/17/16, pp. 18-20). Father testified that he was convicted of arson for setting his car on fire. (N.T. 5/17/16, p. 24). Father stated that while he did set the car on fire, it was not done intentionally, and he was not seeking insurance money. (N.T. 5/17/16, p. 24).

Father testified that "it's just hurting me because I can't take care of people -- everybody's saying that I can't take care of my own flesh and blood." (N.T. 5/17/16, p. 21). Father

---

[8] Father testified that Ms. Ference never liked him and "she would find any kind of reason for me not to get [T.R.R.] back. I'd do the best—I've done everything, I'd do the best I can, I've asked questions, and it just seems like it wasn't good enough for the Agency." (N.T. 5/17/16, p. 86).

26

acknowledged that he had attempted suicide several times, the last time in 2011. He acknowledged that one of the attempts was near the time that T.R.R. "first came into the system." (N.T. 5/17/16, p. 22). However, Father testified that he has not had suicidal thoughts since 2011, and he is no longer on anxiety medication, per the Lenape Valley Foundation doctor. (N.T. 5/17/16, p. 22).

Father testified that he "wants the best for T.R.R." (N.T. 5/17/16, p. 55, N.T. 7/18/16, p. 6). He stated that as directed by the Agency, he has learned to set limits for T.R.R. and is conscious of demonstrating better hygiene. Father is concerned that T.R.R. believes that his biological Parents have abandoned him. Father was curious about all of T.R.R.'s behavior issues which were repeatedly suggested by the Agency to be related to visits with his Parents. Father noted that T.R.R. never had those sorts of behaviors prior to being in foster care. (N.T. 5/17/16, p. 75).

Mother testified that she delivered T.R.R. naturally at the hospital on May 7, 2008. (N.T. 7/18/16, p. 53). After T.R.R.'s birth, Mother brought him home to live with her and her grandmother. (N.T. 7/18/16, pp. 54-55). Mother noticed T.R.R. "was a little slow with his talking, but I was working on helping him speed it up a little bit by reading to him and things in that area." (N.T. 7/18/16, p. 56). Mother had no concerns about T.R.R.'s walking or other areas of development, nor did the pediatrician raised any concerns as to developmental delays. (N.T. 7/18/16, pp. 55-56).

Mother knew Father was on probation for arson and had prior mental health hospitalizations, and that he had attempted suicide when she left T.R.R. in his custody in December of 2010. Mother explained: "It's his son. I thought he would like to spend some time with him." (N.T. 7/18/16, pp. 101-103).

Mother testified that the only reasons she could recall as to why the Agency took T.R.R. into care were issues with Father's apartment and a "few issues" with her own house. (N.T.

27

7/18/16, p. 59). Mother stated that she complied with the items listed in the Agency's Safety Plan. (N.T. 7/18/16, p. 59). She attended parenting classes and therapy at Penndel Mental Health. (N.T. 7/18/16, pp. 60-61). Mother testified that she only missed appointments when she had issues with transportation or when her grandmother became ill. She rescheduled missed appointments. (N.T. 7/18/16, p. 63). Notably, the Agency disagreed and objected to Mother's representations as to her attendance and compliance. (N.T. 7/18/16, p. 103). Mother attended therapy during the spring of 2011 and attended her last session sometime prior to July 26, 2011. (N.T. 7/18/16, pp. 65-66). Mother acknowledged that the therapy sessions helped her talk through stressful issues regarding the "kids" or "what was going on at home," but she has never felt the need for additional therapy since that time. (N.T. 7/18/16, p. 66). Mother stated that, to her knowledge, she has never been diagnosed with a mental health problem, nor has she been determined to be intellectually disabled. (N.T. 7/18/16, pp. 66-68). Mother also testified that, per the Safety Plan, Father was only permitted supervised visits with T.R.R.. In compliance with that directive, she always attended visits with Father and T.R.R.. (N.T. 7/18/16, p. 69).

Mother recalled Ms. Ference recommended she receive a mental health evaluation at Ravenhill. (N.T. 7/18/16, pp. 67-68). Mother could not recall why she was recommended to Ravenhill, nor could she recall why she did not attend therapy there. Mother noted: "I'm not too sure because I can't really remember too much." (N.T. 7/18/16, p. 68). Mother stated that she was not permitted to attend therapy at Lenape Valley, as she requested, because Father was attending therapy there. (N.T. 7/18/16, pp. 68-69).

Mother testified that she and Father properly prepared for visits as the Agency directed them, bringing along an activity and a snack for T.R.R.. (N.T. 7/18/16, pp. 73-76). She stated that sometimes she would hug T.R.R., and if he did not want to hug, they would exchange a high-five.

28

Mother recalled that T.R.R. was sometimes upset when a visit ended. (N.T. 7/18/16, p. 90). Mother explained that T.R.R. experienced developmental delays including speech delays and motor skills delays, and he needed braces on his feet. (N.T. 7/18/16, pp. 91-92). Mother remembered that when Ms. Ference recommended decreasing T.R.R.'s visits from weekly to biweekly, she agreed. Mother noted that all these years later, she could not recall why she agreed with Ms. Ference's suggestion that the visits were difficult for T.R.R.. (N.T. 7/18/16, p. 91).

We note that it is irrefutable that Parents attempted to improve their parenting skills and achieve some of the Agency's objectives. However, it was repeatedly apparent, throughout their testimony as well as that of Agency witnesses, that Parents frequently did not comprehend, could not recall, failed to implement, or resisted compliance with the Agency's plan.

The Pennsylvania Superior Court addressed the issue of parental incapacity in In re Angry, 522 A.2d 73 (Pa. Super. 1987). The court held that a finding of incapacity can be based on prognostic evidence regarding how the parents would care for the child if the child were placed in their custody. Similarly, parental incapacity was also found in Matter of Adoption of Embick, 506 A.2d 455 (Pa. Super. 1986), allocatur denied, 520 A.2d 1385 (Pa. 1987). In Embick, the parents demonstrated a lack of understanding regarding how to raise children, as well as inability to understand the childrens' specific needs. A finding of incapacity was also found in In re William L, 383 A.2d 1228 (Pa. 1978) cert. denied 439 U.S. 880 (1978), where mother demonstrated an inability to grasp parenting skills, was unable to control her children, and functioned at a twelve-year old level. In In re N.C., 763 A.2d 913, 918 (Pa. Super. 2000), the Court recognized the regrettable circumstance when a parent's inability to provide adequate care for his or her children stems at least in part from inherent deficiencies. The Court noted that "the law is clear that parents

29

who are incapable of performing parental duties are no less unfit than parents who refuse to perform them."

Applying the applicable case law to the instant facts, the Agency presented clear and convincing evidence of Mother's and Father's frequent and continuing incapacity to reasonably parent T.R.R.. This was apparent on an ongoing basis, as individuals from various provider agencies supervised visits between Mother and Father and T.R.R., and provided relevant testimony. (N.T. 5/16/16, pp. 19-20).

Spanning the entire time period during which Mother and Father had visits with T.R.R., the evidentiary record is replete with examples of their inability to adequately recognize T.R.R.'s cues, needs and desires. Ms. Ference testified that during the time frame she observed visits, the parents were inconsistent, failed to put prompts into action, and refused to respect T.R.R.'s need for personal space. (N.T. 3/10/16, p. 57-58). Ms. Ference testified that considerable prompts over a long period of time were required before she convinced Father to shower, shave and wear clean clothes to a visit. (N.T. 3/10/16, p. 57). Ms. Flores also testified that she addressed hygiene with Father. She testified that it was an ongoing issue, and she endeavored to be sure Father was aware of everyday basic hygiene skills for himself and a child. (N.T. 1/11/16, p. 152).

Like Ms. Ference, Ms. Flores also testified that Father's conduct required that she constantly remind him of the need to not speak so loudly and to be aware of T.R.R.'s need for personal space. (N.T. 1/11/16, pp. 152-153). We believe Father truly attempted to perform as well as he could in developing his parenting skills, and we found Father's overall testimony to be credible. However, despite Father's best intentions, the record supports our finding that the Agency provided clear and convincing evidence that the parental incapacities that existed when T.R.R. initially came into care in 2010 have not and cannot be remedied. This is true not only

30

based upon Father's admitted inability to parent T.R.R. alone, but also based upon the record which evidenced Mother's failures to initially recognize the reasons why T.R.R. came into the care of the Agency, and the evidence of Mother's pattern of non-compliance with Agency recommendations for treatment. This is especially important, as it was essentially a condition precedent to Father's opportunity for reunification with T.R.R.. § 2511(a)(2).

The above examples were validated by many witnesses who offered testimony that Mother and Father consistently demonstrated a lack of understanding as to how to appropriately interact with T.R.R. during short periods of supervised visits over the years. Logically, then, Mother and Father would have significantly greater difficulty responding and meeting T.R.R.'s cues, needs and desires if they were his custodians on a daily basis. See In re Angry, *supra*. Perhaps most significant and demonstrative of Mother's and Father's parental incapacity is their disinclination to recognize that T.R.R. has special needs, and their inability to understand the impact of so many years in foster care on his emotional functioning. Mother and Father often appeared to place their personal desires to parent T.R.R. above his need for stability and permanency. Arguably, Mother's and Father's inability to remedy their parental incapacities stems from inability to recognize their limitations. Accordingly, their compromised perspectives are fixed, and not reasonably subject to remedy.

In In re B.L.W., 843 A.2d 380 (Pa. Super. 2004), the Superior Court affirmed a lower court's decision to terminate parental rights when the evidence demonstrated that the mother achieved only limited success with her counseling, and did not have the ability to exercise sound judgment, given her intellectual limitations which could not be remedied or improved. In that case, the expert opined that counseling sessions, parenting courses or "appropriate support" cannot

31

prepare for every possible scenario to prepare a parent to exercise proper judgment when a novel situation arises.

> There are many cases wherein the inability of the parent to provide children with the necessary care, control, and subsistence necessary for their physical or mental well-being cannot or will not be remedied. Clearly, in the instant case, despite Mother's stated desire to raise her child, her incapacity cannot be remedied. We stated in In re B.L.L., 787 A.2d 1007, 1013 (Pa. Super. 2001):

>> The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state, may properly be considered unfit and may properly have his or her rights terminated.

> ...The record herein compels our conclusion that Mother is not capable of providing B.L.W. with a safe and healthy environment in which to live, and there is no evidence in the record that this fact could change. "A parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties."

In re B.L.W, *supra.* at 387

The instant case presents a similar dilemma for Parents. Based upon the evidence, it is clear that the conditions which have caused Mother's and Father's incapacity have not been remedied over a reasonable period of time; nor will they be remedied in the reasonably near future. T.R.R. has been in the care of the Agency for more than six (6) years. During this time, various social workers and other personnel have attempted to work with Mother and Father to effectuate a change in their attitudes and behaviors. Essentially, the result has been the same; due to the parents' incapacity, they are not reasonably capable of recognizing T.R.R.'s needs or their inability to meet those needs. The quantum of improvement as parents has not been sufficient.

## B. THE AGENCY PRESENTED CLEAR AND CONVINCING EVIDENCE IN SUPPORT OF TERMINATING THE PARENTAL RIGHTS OF MOTHER AND FATHER PURSUANT TO SECTION 2511(a)(5) OF THE ADOPTION ACT.

Section 2511(a)(5) of the Adoption Act provides that parental rights may be terminated if:

> "(a)(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and the termination of parental rights would best serve the needs and welfare of the child".

In Matter of Adoption of Embick, *supra.*, the Superior Court affirmed the lower court, which held that the conditions that led to the child's placement continued to exist. Specifically, the court found that the parents still did not have adequate parenting skills, budgeting skills, stable housing or employment. At the trial court level, clear and convincing evidence was presented to establish that the parents had refused to cooperate with assistance offered. Accordingly, the trial court held that the parents would not be able to remedy the conditions which led to the removal within a reasonable period of time. Additionally, the court found that available services would not be remedial, because such services had been repeatedly offered and refused. Lastly, the court found that termination of parental rights was in the best interests of the child.

Similarly, in In re Adoption of Steven S., 612 A.2d 465 (Pa. Super. 1992), the Superior Court found sufficient evidence to support termination where father refused to participate in recommended treatment and mother did not "meaningfully participate" in any treatment. Specifically, the court found that during the eight-year period the child was in foster care, the parents not only failed to acknowledge the need for services, but also failed to remedy the conditions which led to the child's placement.

33

We would be remiss if we did not acknowledge that the record in the present case included testimony and evidence of actions by the Agency that disappointed this Court. We believe that during its long history with this family, perhaps due to frustration, the Agency occasionally strayed from its best efforts. Nonetheless, applying the statute and relevant decisional case law to the instant case, it is undeniable that the Agency presented clear and convincing evidence to support termination, pursuant to §2511(a)(5). T.R.R. has been in foster care for more than six (6) years. During that time, numerous services were provided by the Agency, and the parents have been unable to achieve the objectives outlined in the Permanency Plan. Significantly, Father has acknowledged that he cannot parent T.R.R. alone. Unfortunately, Mother has continuously failed to comply with reasonable requirements of the Agency, even with the knowledge that Father's progress toward reunification has been directly contingent upon her compliance.

## C. THE AGENCY PRESENTED CLEAR AND CONVINCING EVIDENCE IN SUPPORT OF TERMINATING THE PARENTAL RIGHTS OF MOTHER AND FATHER PURSUANT TO SECTION 2511(a)(8) OF THE ADOPTION ACT.

Section 2511(a)(8) of the Adoption Act provides that parental rights may be terminated if:

> (a)(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, twelve months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement continue to exist and termination of parental rights would best serve the needs and welfare of the child.

…Section 2511(a)(8) explicitly requires an evaluation of the "needs and welfare of the child" prior to proceeding to Section 2511(b), which focuses on the "developmental, physical and emotional needs and welfare of the child." Thus, the analysis under Section 2511(a)(8) accounts for the needs of the child in addition to the behavior of the parent. Moreover, only if a court determines that the parent's conduct warrants termination of his or her parental rights, pursuant to Section 2511(a), does a court "engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." Accordingly, while both Section

34

2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8),

In re I.E.P., 87 A.3d 340, 346 (Pa. Super. 2014).

In In re J.F.M., 71 A.3d 989 (Pa. Super. 2013), the Court held:

> Sufficient evidence supported involuntary termination of mother's parental rights pursuant to the statutory provision allowing termination when child has been removed from the care of parent for at least 12 months, the conditions that led to the removal or placement of child still exist, and termination would serve the needs and welfare of child; although mother complied with some aspects of her family service plan, evidence established that the conditions that led to child's removal, including mother's limited intellectual abilities and lack of parenting skills, had not been corrected, as mother was still overwhelmed by daily demands of parenting and failed to recognize safety risks to child...23 Pa.C.S.§2511(a)(8)

As the Superior Court has repeatedly indicated:

> termination under subsection (a)(8) "does *not* require an evaluation of [the parents] willingness or ability to remedy the conditions that led to placement of the children." R.J.S., 901 A.2d at 511 (emphasis in original); *see also* In re S.H., 879 A.2d 802, 807 (Pa. Super. 2005); In re J.T. and *R.T.*, 817 A.2d 505, 509 (Pa. Super. 2003). Instead, as we recently reaffirmed in an *en banc* decision, subsection (a)(8) "requires only that the conditions continue to exist, not an evaluation of parental willingness or ability to remedy them." C.L.G., 956 A.2d at 1007 (citing S.H., 879 A.2d at 806).

In re I.J., 972 A.2d 5, 11 (Pa. Super. 2009)

Applying the pertinent rules of law here requires that the parental rights of Mother and Father be terminated. The Agency presented clear and convincing evidence in support of such termination. Again, T.R.R. has consistently been in foster care during the past six (6) years.

35

**D. TERMINATION OF THE PARENTAL RIGHTS OF MOTHER AND FATHER WILL BEST SERVE THE NEEDS AND WELFARE OF T.R.R., AS REQUIRED PURSUANT TO SECTION 2511(b) OF THE ADOPTION ACT.**

As the Agency clearly and convincingly established the criteria as set forth by 23 Pa.C.S.§2511(a),(2),(5), and (8) for termination[9], this Court next examined, pursuant to §2511(b), whether upon consideration of the developmental, physical, and emotional needs and welfare of T.R.R., the termination of Mother's and Father's parental rights served his best interests. We have concluded that the Agency clearly and convincingly established these criteria.

When considering what situation would best serve a child's needs and welfare, the trial court must examine the status of the natural parental bond. In re Z.P., *supra.*, 994 A.2d at 1121.

The Superior Court has described the bonding analysis required of the trial court as follows:

> When conducting a bonding analysis, the court is not required to use expert testimony. ...Social workers and caseworkers can offer evaluations as well... Additionally, Section 2511(b) does not require a formal bonding evaluation... "Above all else ... adequate consideration must be given to the needs and welfare of the child."... A parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights. ..
>
> Before granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the *intangible* dimension of the needs and welfare of a child—the love, comfort, security, and closeness—entailed in a parent-child relationship, as well as the tangible dimension. Continuity of relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the child[ren]'s needs and welfare, must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial.

*Id.* (internal citations omitted).

---

[9] The Superior Court need only agree with the trial court's conclusions regarding any one subsection of § 2511(a) in order to affirm termination of parental rights. In re S.C.B., 990 A.2d 762, 770 (Pa. Super. 2010).

Turning to the instant case, T.R.R.'s current Foster Mother testified that she and her husband are foster parents through Pinebrook Family Answers. She resides with her husband, biological daughter, and T.R.R. (N.T. 1/11/16, pp. 57-62). The Foster Mother recalled that T.R.R. first came to their home when he was three and one-half (3 ½) years old, in September of 2011, for a respite weekend from another Pinebrook foster home. By the end of September of 2011, T.R.R. was residing with the present foster parents on a full-time basis. (N.T. 1/11/16, p. 59). The Foster Mother testified that T.R.R. was in three (3) foster homes prior to being placed with her family. (N.T. 1/11/16, p. 61). Caseworker Flores observed that upon moving into his present foster home, T.R.R. was "happy and content," and that T.R.R. immediately started referring to his new foster parents as "mom" and "dad." (N.T. 1/11/16, 144).

Ms. Horn testified that there were reports of T.R.R. "acting out" before and after his scheduled visits with Mother and Father. (N.T. 5/16/16, pp. 23-24). Ms. Flores also testified as to T.R.R.'s behavior before visits, when she picked him up to transport him, and after the visits, based on the foster mother's reports. (N.T. 1/11/16, pp. 154-155). Ms. Flores stated that during the two to three (2-3) months T.R.R. resided with the foster family which preceded his current placement, they reported that T.R.R. was defiant after visits, would "act out," and that his behavior declined. Ms. Flores testified as to the lack of personal bond between T.R.R. and his parents; "he would allow [Mother] to hug him once in a while. [Father] no. Maybe once in a blue moon in the three years that I remember him allowing it. But for the most part, no." (N.T. 1/11/16, p. 149).

Ms. Flores recalled that after the visits, T.R.R. would always say that "he was done and asked for no more visits. Most of the time he was very—after the visits he would a lot of the times hugs or kisses from the biological parents, run to me." (N.T. 1/11/16, p. 148). T.R.R. would then

37

sit quietly during the car ride home and he would say "Miss Ellie, no more visit" or he would say "I did that visit, no more visits. Me done..." (N.T. 1/11/16, p. 148).

We also heard the testimony of the current foster parents regarding visitation. Foster Mother recalled that T.R.R. expressed heightened anxiety around visitation with Mother and Father. Specifically, T.R.R. "would pace. He would throw himself onto the furniture. If he would throw himself onto a chair or sofa, he would then slide onto the floor and roll around, then pick himself up and do it over again. He would destroy things." (N.T. 1/11/16, p. 68). She also testified that immediately preceding visits, T.R.R. would "rip paper, rip books, break game pieces/toy pieces, things like that." (N.T. 1/11/16, p. 68). The Foster Mother recounted that when T.R.R. returned from visits, he "was still very antsy. Very—couldn't sit still. Could never keep his hands still." (N.T. 1/11/16, pp. 69-70). She described that after visits, T.R.R. would take his frustration out on her: "...hitting, kicking, spitting at me. Yelling at me" and T.R.R. would experience night terrors and urination problems. (N.T. 1/11/16, p. 70). The Foster Mother testified that T.R.R. developed excessive eye blinking which evolved into tics where he would "shrug his shoulder constantly and wipe his brow constantly." (N.T. 1/11/16, pp. 71, 73). She stated that T.R.R. saw a pediatric neurologist for the eye blinking and tics, who attributed such behavior to nervousness. (N.T. 1/11/16, pp. 73-74).

Foster Father concurred that following visitation with Mother and Father, typical behavior exhibited by T.R.R. for three or four days thereafter included bed-wetting, kicking, screaming, punching the floor, spitting, and having outbursts which Foster Father described as practically having a "nervous breakdown." (N.T. 3/10/16, p. 11). Foster Father noted that once T.R.R.'s behaviors would begin to normalize, it was time for another visit. (N.T. 3/10/16, p. 11). Foster Mother testified that T.R.R. refused to talk about the situation, and was overheard at a baseball

38

game stating "he could shoot himself or something." T.R.R.'s frustrations continued in the school setting, as well. It was reported that T.R.R. would call classmates names, break their belongings, and roll his eyes when his behavior was redirected. (N.T. 1/11/16, pp. 87-88).

Foster Mother recalled that a closing visit with Parents was held on April 11, 2014, and that once parental visitation ceased, the change in T.R.R. was "remarkable. He – the tics nearly completely went away. Far fewer tantrums in – at all. Maybe once a month, if that. Generally more agreeable. Much less concerned about routine — where we were going, what we were doing, who was coming over. Just overall a much happier little boy." (N.T. 1/11/16, pp. 82, 84).

Ms. Flores also testified that when the visits were suspended in 2014, T.R.R.'s "anxiety went down significantly…. [t]he whole atmosphere [when she visited the foster home] was just different. He knew he wasn't going anywhere…it was like a relief." (N.T. 1/11/16, pp. 173-174). She further described that T.R.R. "was at a very good place" (N.T. 1/11/16, pp. 173-174). Ms. Flores testified that she explained to T.R.R. that his biological parents love him so much that they want him to stay with the foster family. Ms. Flores described T.R.R.'s reaction to this news as being "over the moon." (N.T. 1/11/16, p. 176).

Ms. Flores testified that T.R.R.'s positive change in behavior and decreased anxiety continued until April of 2015, when he observed his parents at a permanency hearing. (N.T. 1/11/16, pp. 174-175). Ms. Flores recalled that T.R.R. immediately asked if he had to visit with his Parents and then "I saw the anxiety and he began to rip at his fingers. It went right back." (N.T. 1/11/16, p. 175). Ms. Flores observed that T.R.R.'s negative behaviors continued to escalate after seeing Mother and Father in the courthouse. Specifically, T.R.R. became "angry, upset, really lash[ed] out at the family." (N.T. 1/11/16, p. 175). Ms. Flores testified that when she processed

T.R.R.'s behaviors with him, he asked "are you going to make me move?" T.R.R. also said "Don't move me from my family. I want — this is my family." (N.T. 1/11/16, p. 175).

Both Foster Parents offered similar, corrobative testimony about T.R.R.'s positive behavior from April 2014 until April 2015, until T.R.R. saw Mother and Father in the courthouse at a permanency review hearing (N.T. 1/11/16, pp. 84-86, N.T. 3/10/16, p. 12). Foster Mother testified "it was like we went back to the beginning, like all the progress had disappeared. He – it was awful. He physically was tic-ing so badly it was disruptive. He could not walk a straight line without his shoulder, his wiping his brow, turning his foot. He could not – it just physically was hard to watch. And then his — he just became so mean, so mean…" (N.T. 1/11/16, pp. 84-86).

Regrettably, the record is replete with evidence establishing the lack of a necessary and beneficial parental bond between T.R.R. and Mother and Father. Numerous witnesses testified as to T.R.R.'s anxiety, and related negative behaviors surrounding visits with Mother and Father. Over the years, T.R.R. told numerous workers, on multiple occasions, that he did not want to visit with Mother and Father.

Despite Father's suggestion that the foster parents may have spoken negatively to T.R.R. about visits, the record did not include any indication of the accuracy of this assertion. Ms. Horn noted that she did not have any concerns that the foster parents had ever attempted to undermine Mother and Father. (N.T. 5/16/16, p. 24). In fact, Ms. Horn testified that the foster parents were so committed to T.R.R. and "things going well for T.R.R.," that they began to drive T.R.R. to the visits so it would be easier for him. (N.T. 5/16/16, p. 25). Foster Father also testified that he began to transport T.R.R. to parental visits to reassure him that when the visits were over he was returning home with his Foster Father. (N.T. 3/10/16, p. 11). Ms. Horn confirmed that the Agency does not believe that T.R.R. harbors ill feelings toward his biological parents. Rather, "the Agency believes

40

that T.R.R. is fearful of his birth parents because he views them as impediments to his permanency with [the foster family]. (N.T. 5/16/16, pp. 29-30).

Ms. Horn testified as to T.R.R.'s wishes: T.R.R. wants to be adopted by his foster family; T.R.R. wants a normal childhood; T.R.R. wants the same last name as everyone else in his home. (N.T. 5/16/16, p. 28). Ms. Flores also related that subsequent to the closing visit in April of 2014, T.R.R. asked "Why am I not a [foster surname] and just slammed his hands." (N.T. 1/11/16, pp. 176-77).

Foster Mother explained that during the five (5) years that T.R.R. has resided in their home, he has received physical therapy, speech therapy and occupational therapy to address his inability to walk upstairs, his lack of control when eating, and his unrecognizable speech. (N.T. 1/11/16, p. 60, 62). She noted that T.R.R. saw an orthopedist at CHOP and was evaluated for low muscle tone. (N.T. 1/11/16, p. 64). T.R.R. also received physical and speech therapy at Fair Play in Quakertown. Upon completion of physical and speech therapy, T.R.R. began occupational therapy at Fair Play for fine motor skills. (N.T. 1/11/16, pp. 64-65).

As to treatment for T.R.R.'s behavioral issues, Foster Mother testified about wrap-around services through Penn Foundation. Specifically, a mobile therapist and behavioral specialist were assigned to work with T.R.R. in the home and at school. (N.T. 1/11/16, p. 66). Notably, Ms. Flores testified that T.R.R.'s therapist, his behavioral specialist and the parenting educator were each present at some of the visits between Parents and T.R.R.. The purpose of their presence was to help the parents and to teach them how to engage and bond with T.R.R., and read his cues. (N.T. 1/12/16, pp. 113-114). Ms. Flores stated that despite the presence and assistance of a parenting educator, the behavioral specialist, the mobile therapist, the Agency social worker, and her, Parents were never able to develop a bond with T.R.R.. (N.T. 1/12/16, p. 125).

Foster Father noted that when T.R.R. came to live in their home he had a lot of fear and anger; and that throughout the time T.R.R. has resided with his family, they have tried to give him stability, security and love. (N.T. 3/10/16, pp. 5-6). According to Foster Father, T.R.R. just "wants to be normal. He wants to be like all the other kids. He wants to be safe. He wants to be secure. You know, he wants to live in our house. He wants to call [our daughter] his sister and know that it's for real. That's what he wants. He just wants to be like all the other kids. He wants to be normal." (N.T. 3/10/16, p. 16).

The foster family has tried to give T.R.R. a "normal" life, including participation in floor hockey, baseball, soccer, Tae Kwon Do, and Cub Scouts. (N.T. 3/10/16, p. 7-8). The Foster Father explained that T.R.R. continues to struggle with being different than other kids: "I'm his Cub Scout leader and I go to give him an award, there's a lot of questions that he gets from other kids and from parents of why his name is [ ] and my name is [ ] and what's going on. And that just—that scab, it just keeps getting picked, and it never heals....It is absolutely upsetting to him." (N.T. 3/10/16, p. 15).

Foster Father stated that school is challenging for T.R.R. and that he and his wife have spent considerable time working with T.R.R. and teaching him basic scholastic skills. (N.T. 3/10/16, p. 8).

Both Foster parents testified that they have not wavered in their commitment to being an adoptive resource for T.R.R.: "He needs permanency, he needs security, and we want to keep him in our home." (N.T. 3/10/16, p. 18).

Ms. Caramencio, who was qualified as an expert in the field of assessments and treatment recommendations for traumatized children, testified as a witness for the Agency. She participated in three (3) sessions with T.R.R. in April, 2016, for the purpose of determining whether it was in

42

T.R.R.'s best interests, emotionally and psychologically, to be adopted.[10] (N.T. 4/28/16, pp. 103, 109-110, 112). Ms. Caramencio stated that in addition to meeting with T.R.R., Foster Mother and Ms. Horn, she also reviewed collateral information in order to make her recommendation. (N.T. 4/28/16, p. 113).

Ms. Caramencio testified that T.R.R. expressed fear during the sessions with her because he believed Mother and Father were "going to take him away from his forever family." T.R.R. stated he is no longer scared because he doesn't have visitation with Mother and Father. (N.T. 4/28/16, p. 118). Ms. Caramenico recalled that T.R.R. stated he would be sad if he was reunited with Mother and Father. (N.T. 4/28/16, p. 118). T.R.R. expressed frustration and anger that his last name was not the same as his [foster] sister. (N.T. 4/28/16, p. 118).

Ms. Caramenico testified that T.R.R. told her "he likes everything about his forever home...and his favorite thing is his mommy," referring to his foster mother. (N.T. 4/28/16, p. 117). Ms. Caramenico noted that T.R.R. also stated "he feels good about living with and being a part of his forever family," and T.R.R. referred to his foster parents as his daddy and mommy or his forever family, and Mother and Father as his visit family. (N.T. 4/28/16, p. 117). T.R.R. told Ms. Caramenico that he loves his foster family and feels safe with them, and he wanted her to tell the judge that "I want to live here with mom and dad." (N.T. 4/28/16, pp. 119, 122).

Ms. Caramencio related that when she showed T.R.R. scrapbooks containing pictures of Mother and Father, T.R.R. was "ambivalent and emotionally detached" when viewing the photos. (N.T. 4/28/16, p. 125). In contrast, T.R.R. eagerly looked at the second scrap book which

---

[10] Ms. Caramenico testified that approximately eighty percent (80%) of work in her career has been with children. (N.T. 4/28/16, pp. 94-97). Ms. Caramenico explained that "trauma" is subjective to each individual, and based on her involvement with T.R.R., including her review of information provided, her professional assessment was that T.R.R. was a traumatized child. (N.T. 4/28/16, p. 146). Ms. Caramenico testified that the scope of the evaluation she was asked to perform did not include rendering any clinical judgment as to the parenting abilities of Parents.

contained pictures of his life with his foster family, identifying happy memories (N.T. 4/28/16, p. 125).

Ms. Caramenico opined that T.R.R. is a traumatized child. (N.T. 4/28/16, p. 146). She stated that T.R.R.'s behavioral and emotional issues presented the basis for her conclusion that in order for T.R.R. to develop coping skills, help him effectively regulate, appropriately function, and develop secure relationships in the future, it is imperative that T.R.R. have a sense of safety and security. (N.T. 4/28/16, p. 144). In her professional opinion, the adoption of T.R.R. by his foster family would best serve the needs and welfare of T.R.R. (N.T. 4/28/16, p. 143).

We do not doubt that Mother and Father love T.R.R.. It is apparent that they care about T.R.R. and very much want to be parents. However, we must follow the law. The overwhelming weight of the facts established during development of this lengthy evidentiary record clearly and convincingly demonstrate that the parental incapacity which brought T.R.R. into the Agency's care and control more than six (6) years ago continues to exist. The testimony of numerous witnesses, along with Parents, revealed their inability to consistently and adequately understand and act in accordance with the best interests of T.R.R.. Indeed, the testimony frequently reflected a good faith desire of the parents to benefit their own interests above those of T.R.R.. Father testified that he loves T.R.R. and wants to parent him "[b]ecause he is my only child. And who knows? He might be my only child." (N.T. 5/17/2016, p. 116). Mother testified that she loves T.R.R. and wants him to be reunited with him: "I just love my son and I don't want to give up on him. He means the world to me and I – and he's pretty much all I have left." (N.T. 7/18/16, p. 99).[11] Father testified that he doesn't know what is in T.R.R.'s best interest, but that if T.R.R. were to be removed from the foster family, he "might be a regular kid..." (N.T. 7/18/16, p. 10).

---

[11] Mother stated that she has two other sons who are in the custody of their father, and that she never sees them. (N.T. 7/18/16, pp. 100-101).

44

Upon extensive review of this entire record, we determined, that pursuant to application of pertinent law to the credible facts, termination of Mother's parental rights and termination of Father's parental rights is warranted. The record is replete with testimony and evidence regarding the relationship that exists between Mother and Father and T.R.R., and it is apparent that there would be no significant negative effect on T.R.R. should the parents' rights be terminated. In fact, the record convincingly demonstrates the exact opposite. As Ms. Horn reflected, T.R.R. has lived with Mother and Father for less than half of the time that he has lived with the current Foster family. T.R.R. has been denied stability and permanence for too long. In re C.L.G., 956 A.2d 999 (Pa. Super. 2008).

## V. CONCLUSION

For all of the reasons noted above, we are constrained to enter the attached Decrees, granting the Agency's Petitions to Involuntarily Terminate Mother's and Father's Parental Rights as to the Child, T.R.R..

BY THE COURT:

Date: 2/15/17

GARY B. GILMAN,                    J.

N.B.   It is your responsibility to notify all interested parties of the above action.

45

# IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA
## ORPHANS' COURT DIVISION

IN RE: T.R.R.                                      No.: 2014-A9008

**INVOLUNTARY TERMINATION OF**
**PARENTAL RIGHTS OF H.W.R.**

### FINAL DECREE

AND NOW, this 15th day of February, 2017, upon consideration of the Petition and after hearings thereon, and upon Motion of Brad M. Jackman, Esquire, Attorney for the Bucks County Children and Youth Social Services Agency, it is DECREED that all requirements of law have been complied with, that the Petition for Involuntary Termination of parental Rights and duties concerning the minor child, T.R.R. be and is granted, and from this date all parental rights and duties including the obligation of support of the said H.W.R. are terminated and custody is awarded to the Bucks County Children and Youth Social Services Agency. The Adoption may proceed without notice to or consent from H.W.R. Parental rights and duties including the obligation of support shall be assumed by Bucks County Children and Youth Social Services Agency. Said Agency shall stand in *loco parentis* and shall have the authority to consent to, *inter alia*, marriage, enlistment in the armed forces, and to major medical, psychiatric and surgical treatment, and to exercise such other authority concerning the child as a natural parent could exercise, including the right to consent to Adoption.

BY THE COURT:

_____
GARY B. GILMAN,          J.

46

IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION

IN RE: T.R.R.                                            No.: 2014-A9008

INVOLUNTARY TERMINATION OF
PARENTAL RIGHTS OF L.R., Jr.

### FINAL DECREE

AND NOW, this 15th day of February, 2017, upon consideration of the Petition and after

hearings thereon, and upon Motion of Brad M. Jackman, Esquire, Attorney for the Bucks County

Children and Youth Social Services Agency, it is DECREED that all requirements of law have

been complied with, that the Petition for Involuntary Termination of parental Rights and duties

concerning the minor child, T.R.R. be and is granted, and from this date all parental rights and

duties including the obligation of support of the said L.R., Jr. are terminated and custody is

awarded to the Bucks County Children and Youth Social Services Agency. The Adoption may

proceed without notice to or consent from L.R., Jr.. Parental rights and duties including the

obligation of support shall be assumed by Bucks County Children and Youth Social Services

Agency. Said Agency shall stand in *loco parentis* and shall have the authority to consent to, *inter*

*alia*, marriage, enlistment in the armed forces, and to major medical, psychiatric and surgical

treatment, and to exercise such other authority concerning the child as a natural parent could

exercise, including the right to consent to Adoption.

BY THE COURT:

GARY B. GILMAN,                    J.

47

A copy of the attached Final Decrees and Opinion have been sent to the following on February 15th, 2017:

Brad M. Jackman, Esquire
JACKMAN LAW
107 North Broad Street
Doylestown, PA   18901
Attorney for Bucks County Children and Youth

Lisa Horne, Esquire
Guardian Ad Litem
1260 Almshouse Road, Bldg. G, 4th Fl.
Doylestown, PA 18901

Francine W. Kaplan, Esquire
KAPLAN LAW OFFICES
309 Fellowship Road, Ste. 200
Mount Laurel, NJ 08054
Attorney for H.J.W., Mother

Jessica L. VanderKam, Esquire
STUCKERT & YATES
2 North State St.
Newtown, PA 18940
Attorney for L.R., Jr.

Barbara – Law Library
Bucks County Justice Center

Kelly Neff, Bucks County Law Reporter